Thank you, your honors. My name is Lisa Jackson, and I represent Maria Ferro, the claimant in this case, and I also represented Maria Ferro in the prior appeal between the same judges. This appeal we brought because we are appealing the amount of the forfeiture, and our position is that the district court below, even though he was given clear instructions on how to analyze the culpability of Maria Ferro, he did not follow those instructions. Those instructions told him to follow the four factors in the $100,348 in currency case. Under penalty number three, under factor number three, which deals with other penalties that are applied to offenses of the same kind, that should have been applied in this case, but the court didn't do it. It should or should not? It should have. The other penalties, the judge, the district court below, should have looked at the penalties that apply in a felon in possession case, and those penalties are a maximum statutory penalty of $250,000 and a guideline fine and penalty of $75,000. The district court below... Whoa, whoa, whoa. You're forgetting something else. And what is that? $45,000 or $41,000 to 51 months. In other words, the fine penalty, the monetary penalty, is $250,000, $75,000, and or $41,000 to 51 months. Yes, Your Honor, but Maria Ferro was not the violator. Her husband is the one who possessed the filings. But if she were to be charged as an aider or a better, that would be a principle and she would be subject to $250,000, guideline 75, and and or 41 to 51 months in Federal prison, correct? Yes. But she wasn't charged with that. But she wasn't charged at all. That's right. So she shouldn't have been. But if we're going to look at the amount of forfeiture in comparison to what the penalty would be if a crime had been charged, right? But she is judged on the crime that she allowed to transpire on her property, and that was she allowed her husband, a felon, to possess her firearm collection. Right. So the husband was charged with felon in possession. That's it. And he was issued a $75,000 fine. And she didn't, there was no aider and a better. Felon in possession is a non-intent crime. It's a strict liability. If you're a felon and you possess a firearm. You want us to compare the amount of forfeiture to the amount of fine that's available in a felon in possession case. You have to take into consideration not only the fine, but the prison time, don't you? No, I don't think so. Why not? Well, how do you equate prison time? You don't. And that's one of the problems that we have. Because one day of prison time, to me or to you, might be worth $750,000, but may not be somebody else. But under the Constitution, they say a forfeiture is a fine. A fine is money. It's not prison time. The Constitution has equated forfeiture with a fine. That's monetary. So when we have a felon in possession, and his fine for that felon in possession is $75,000, under the guidelines, we're talking about money. We're not talking about prison time and how that equates to money. The fine is what we're looking at. And that's what it says. What's the penalty or the fine? The Constitution says forfeiture is a fine against the owner. And that's what we have here. And in Von Hoff, it said you look to the statutory maximum in the Von Hoff case, which is one of the cases that this Court cited in its Feral 1 case. And in that case, it says when you're going to punish, and in that case, it was also the wife who did not commit the actual offense. It was her husband, and that's why this case is almost exact, because we have the wife who lives in the home, and you're looking to what is the amount that you punish the wife for the acts that she allowed transpire in her home. And in the Von Hoff case, they said very clearly, under the factors, you look to the fines and penalties for that type of crime that the husband had been charged and convicted of. Excuse me. Yes, Your Honor. Yes, Von Hoff involved drugs, didn't it? Yes, it did. And their guideline fine. Let me finish my question. Okay. Sorry. It may even help you. Oh, good. This involved a marijuana grow in a basement, right? Exactly. And she knew it was down there. She knew. Okay. Isn't contraband different from collectible firearms? I would say very much different. And also, Your Honor, in that case, the guideline fine was a million dollars. And the second circuit in the Von Hoff case said that even though she knew her husband was growing the marijuana in the basement and they tried to forfeit her home and her value of the home, it was only $124,000 in value. And the second circuit said that's too much. That's disproportionate to the culpable level of the wife. And that's what we're saying here. In this case, the district court, he said he looks at the fines and penalties that apply to a felon in possession, and then he says, I didn't get any guidance. And then he gives a two-plus-million-dollar fine, a forfeiture, because the firearms are worth $2.55 million. That was in 2007. Today they are far more valuable. And so what he did was he only gave Maria back 10% of that, which would be equivalent to a $550,000 fine. No, the opposite. $2,500,000. $2 million-plus fine. And this is the wife who now here's the situation. She didn't understand the felon in possession law. The judge said in his order that Maria was completely uninterested in the guns, meaning that she really, she didn't look into it. Counsel, arguing the facts to us is not going to be very productive, because we are not going to do the equitable balancing based on the facts. That has to be done by the district court. Okay. I think you're better off by arguing that the district court perhaps took into consideration, even the second time, not only the conduct or inaction of the wife, but also the conduct of the husband. Yes, Your Honor. And I think that we told the district court to concentrate, I think that was the word we used, to concentrate on the conduct of the wife. Yes. Perhaps we should have put an asterisk there and said, and not the conduct of the husband, but we didn't. Exactly. And, Your Honor, he again, the district court, he again was examining Robert Farrell's mens rea, saying he intentionally did that, and Maria was an aider and a better. Let me ask you one thing that you mentioned, and I don't know if I got my note right, was it your claim that in the Von Hoff case, had the husband been punished solely by a fine, the maximum amount was $1 million? No. They took all they did in the Von Hoff case, they took away his half of the house, and I'm sure he did some prison time, or I don't know what. Can you tell me what was the maximum fine for Von Hoff's husband? $124,000. $120,000? They forfeited the house, and the house, the total amount. I guess I'm not making myself clear. Let me try again. Suppose the sentencing guideline had been applied to manufacturing of marijuana in the house. The guideline punishment would have been $40,000, right? No, the guideline fine went from $40,000 up to $1 million. Oh, $40,000 to $1 million. And they found that the wife's, to forfeit the house from the wife at $124,000 was grossly disproportionate. So here you would argue that if the maximum amount of fine is $250,000. That's a statutory max. Statutory maximum. And the guideline fine is $75,000, and the judge is forfeiting $2.5 million. Well, the judge is after 20%. It's really $2 million. Yeah, a little over $2 million. Imagine if the firearms were only worth $100,000. Can you imagine if you're fining a wife who just happens to be in the house with her husband, who is prohibited from possessing guns, and you give her a $2 million fine? That's grossly disproportionate. It's outrageous. And that's what happened here. What was the amount of the collectibles, the value of the collectibles? Over $2 million. No, $2.5 million. And that was in 2007. Are you claiming that the value of the collectibles now should be revalued on remand? They're probably more valuable. That's why you haven't argued that in your brief. I did argue. In the footnote, I said they're most likely because they're gold-plated, they're pearl, ivory handles, pearl handles, everything. But, Your Honor, Maria could not have. Those collectibles were not. Those collectibles, were they forfeitable? They're forfeitable up to the amount that it doesn't become an excessive fine. I said those collectibles you could possess legally. Absolutely, Your Honor. These are all legal. Why should they be? Why don't you be quiet for a minute? I'm sorry, Your Honor. So we can ask our questions. I'm sorry. Yeah, you know, you're a good advocate, but you've got to give somebody else a chance to talk once in a while. I'm sorry, Your Honor. That's all right. That's all right. But those collectibles, they were not illegally possessed, were they? Now you're not talking, you're just nodding your head. All of the firearm collection were legal firearms. Any illegal firearm, Maria Farrell forfeited to the government. So any of them, we had an expert appraiser go through from the largest auction house in the nation, Pat Hogan. He went to the ATF. He looked at all of the firearms, and he gave them a value, and he assured that all of these were legal and could be sold on the market as legal firearms. So all the firearms we're talking about right now are legal to own. All right. Thank you. And Maria Farrell in the district court claimed that Maria could even be found to be an aider and a better. But under the law, to be an aider and a better, you have to participate in the crime, and you have to take action that would make the crime succeed. She did nothing. The court, the district court found that she was totally uninterested. His words are completely uninterested in the guns, and that her failure to inquire of her husband whether he could own them or not was her culpability. And if you look at that, that is negligence. And I put that in my response brief very clearly. It shows the law. And under the law, you cannot accuse someone of being an aider and better when they were clearly just negligent. And that's in my response brief, Your Honors. And she wasn't willfully blind either, because she didn't even know that her husband was prohibited from purchasing the guns. Guns, these are legal guns. It's not like these are drugs. The average person is not going to know the felon in possession law. And even the district court admitted that. He said the vast majority of the public, they don't know about the felon in possession. So it's not like when Maria is seeing her husband with a gun, if ever, and they were all hidden in the house, she's not saying, oh, there's a crime being committed here, because she doesn't even know about the law. So at best, she was negligent. Honestly, she was negligent. As the owner of the guns, she should have known the law. But you can't impute specific intent crimes onto someone who truly did not understand the law. And it's reasonable. May I ask a question? Wasn't there some testimony that Mrs. Farrell was told by her husband that after service of his time in the state penitentiary, he could possess the guns? Yes. He was telling her. Second question. Did the magistrate make any adverse credibility findings as to Mrs. Farrell? Did he say she was not worthy of belief because of any contradictions? Yeah. In the first trial, he found Maria to be very credible. And then at the remand hearing, he claimed that there were some inconsistencies in her testimony. And that's what I did in my opening brief and in my response brief. Yes, Your Honor? The answer to Judge Bea's question is no, isn't it? Yeah, no, Your Honor. Okay. Well, it's no except that he did find on the second go-around that her testimony was inconsistent. So, therefore, he might not credit her claim that she was told by her husband that he could possess the guns. Right. Okay. Right, Your Honor. So what kind of remedy would you like? I would like you to instruct the district court to follow factor three in the 100,034. We don't usually call them up and say follow factor three. We usually give them a decision, an order. What do you want us to do, reverse and remand? Yes, Your Honor. Okay. Reverse and remand and ask that he follow the third factor of the currency case, that he follow the other penalties and fines available, applicable to a felon in possession offense. And even Maria Farrow didn't commit the offense, and she didn't do anything to harm anyone or do anything wrong. She should be on the lower end of the guidelines, if you look at the specifics. Are you going to save some time for rebuttal? Yes, Your Honor, I want to save. I'll give you a minute for rebuttal, but one more question. Okay. So your position is that if on remand and we instruct them to follow, instruct the magistrate and judge to follow the currency case factor number three, then the maximum amount of money that he can forfeit is the maximum amount of fine, which would be $250,000. And your client should be getting $2,250,000 instead of $500,000, correct? Exactly. I've got you. Let's hear from the government. Thank you, Your Honor. Thank you. Good afternoon. May it please the Court, I'm Stephen Arwelk, Assistant U.S. Attorney representing the government. I'd like to start with this issue of the fine and discuss that. The idea, it is not accurate to say that the Constitution defines a fine as a penalty or that forfeiture, the Constitution doesn't talk about forfeiture at all. The guiding decision, the guiding principle here is the Bajikasian case, the Supreme Court opinion, which says that in determining forfeitability, whether it's excessive, the question is one of the things that the Court has to look at are all of the penalties that are applied with respect to a certain violation. That would include, as the Court pointed out, not only imprisonment and fines, but restitution and forfeiture, which is separate. Yes, Your Honor. How much money, Bajikasian involves someone taking more than the allowable amount out of the country, right? Correct, yes. What was the total amount of money involved? The total amount of money, I believe, was 350, around $350,000. The violation was failure to report more than $10,000. And how much was remitted? I believe the Court ended up ordering a forfeiture of only $10,000. But the basis for that was based – So the answer to my question is that $290,000 was remitted. Correct, yes. Correct? That's correct, Your Honor, yes. Okay. Go ahead. Actually, more than that. I think it was $340,000, because it was $350,000 total. Gotcha. But the point – the reason that that was so high was because when the Court entered into the analysis of the severity of the – the seriousness of the offense versus the amount of the forfeiture, the determination both at this level – in fact, the Ninth Circuit declared the forfeiture statute unconstitutional. The Supreme Court said it wasn't – the statute itself wasn't unconstitutional, but that it was improper and it was excessive to the extent that it required the full amount of forfeiture because the interest that was trying to be protected was just not that important. It was just a reporting requirement. There was nothing illegal. The person who was taking the money out of the country, it wasn't illegal for him to take the money out of the country. It was just illegal for him to fail to report it. And the guidelines penalty was $5,000 fine and up to six months in jail. Correct, yes. But, again, the deciding factor there in that case, which was a criminal case, an in personam case against the person who had committed the crime, was that both at the circuit level and at the Supreme Court, the courts determined that the violation just wasn't that serious. And that was really what drove that decision. But unlike the facts in this case, Mr. Bakakagian was the person who actually did the event, right? Correct, and he was actually – that was a criminal forfeiture case, so he was actually prosecuted in that case. He's the one taking the money out of the country? Correct, yes. In this instance, the underlying or predicate offense, if you will, is Mr. Farrow's possession of these weapons after his state court felony, correct? Correct. Just focusing on Maria Farrow, tell us what she did that necessitates only a 20 or I take it you think it should be less than 20% remission. The government contends that there should be no remission whatsoever in this case. And the reason why is because Mrs. Farrow, based on – this is clear the government would contend, especially after the remand proceedings, where her testimony changed materially, as was pointed out in some detail by the district court. Her level of knowledge about these weapons at the time of trial was that she didn't know anything about them, that she was only aware of about 20 weapons when there were over 1,600 in the house, some of which were hidden, but many of which were wide open in the open. Does the government think that Maria Farrow was sophisticated enough to know the difference between what could be lawfully possessed and what could not be lawfully possessed? I'm not sure what the answer to that question is, and I don't think it matters, Your Honor, because as this court held in Farrow 1, whether Maria Farrow knew that it was illegal for all those guns to be in the house after her husband had been convicted of a felony is not the proper standard to be applied here. Let me turn the question the other way. The government inventoried all of these items, correct?  And concluded that some of them, in fact, were contraband. Yes. Correct? Correct. Did she ever contest that? She did not contest the contraband weapons, no. Her claim relates to the collectibles. The non-contraband weapons, yes, some of which are collectible, but hundreds of these guns are not collectible. Let's call them non-contraband. Okay. Okay? Yes. So she accepted the government's decision on what was contraband and what was not? Yes, that is true. Okay. Other than turning a blind eye, what else did she do? Well, as explained in the briefs, the other thing she did was she actually herself also illegally possessed and owned all of these weapons because of the plea that she had entered in 1998 that made it illegal for her, under California state law, to possess or own firearms of any kind. The district court refused to consider that, correct? Yes, without explaining why. But in light of the fact that this court instructed the district court on remand to consider Maria Farrell's culpability in connection with this violation, with the possession of these guns by Robert Farrell in the family home, certainly the legality of her ability to possess these guns seems clearly to be relevant to the issue of her responsibility for having all these guns in the house. What could she have done that would have completely, I understand this is hypothetical, what could Maria Farrell have done to completely exonerate herself in terms of remission? Sell the weapon? She could have sold them or she could have turned them over to a federal firearms licensee with whom there were several federal firearms licensees that Mr. and Mrs. Farrell had done business with over the years. She could have done any, she could have turned them over to someone who was not a prohibited person and not allowed her convicted felon husband to continue to possess them in the house. She could have rented them. If someone cannot lawfully possess a weapon, can they sell it? They can, yes. Under federal law, actually under federal law, Your Honor, the prohibition is on possession of the weapon, not to own it. Now, the prohibition that applied to her under state law applied to both possession and ownership. But Robert Farrell's prohibition was against possession of firearms. So he could have owned them, but based on the stipulated facts, he had released his ownership interest to all of these guns back in 1992 right before he was convicted of a felony. And she owned them. That's a given. She owned the weapons. Yes. Is that right? That is correct, Your Honor. I didn't hear you.  I didn't hear you. Okay. Thank you. Now, what is the government's interest in taking a vast collection worth probably $2.25 million roughly, weapons that are collectible, that are not illegal to possess, and then seek to have 100% of them forfeited? What's the government's interest in that? The government's interest in any felon in possession case, Your Honor, is to prevent conviction. But those guns, a lot of those guns were not fireable, although they could have been made where they could put out a projectile. But, I mean, is it that it's going to be part of the collection that will be displayed in Washington at the FTA offices? Is that the purpose of it? That is not the purpose, Your Honor. The purpose is that the federal kind of ---- It kind of smells a little bit like that purpose now, doesn't it? I can assure the Court that that's not the purpose. They're not going to be ---- But it's, to coin a new phrase, it smacks of it, doesn't it? Well, unfortunately, I can see why it might to someone, but knowing what's going to happen to these firearms, I know it's not. That's not what's going to happen. The purpose of the government's interest here is that there is nothing in the federal firearms statute that exempts collectible guns. These are operable guns. These are not guns that didn't work. All of them were operable. Dozens of them were loaded. A lot of them had silencers attached to them, and it's true that she did not, that Maria Farrow did not contest the forfeiture of those weapons, the illegal weapons in the NFA. Absolutely. What's that got to do with the collectibles? The only connection it has to the collectibles is that those various types of weapons were not stored separately from one another. They were all mixed in with one another. But the government's, what the government is urging here, and the reason for this forfeiture is, it's that Congress has enacted strict firearms laws that say a convicted felon is not allowed to possess a firearm. There's no exceptions there. They're not allowed to do it. This person had over 1,600, and if we just talk about the so-called collectibles or the non-contraband firearms, we're talking about more than 1,300 operable firearms stored in a suburban house in a regular neighborhood. And the idea that Congress intended for that to happen, for a felon to be allowed to do that and for those guns not to be subject to forfeiture is materially inconsistent, not only with the statute, but with the sentencing guidelines. You're telling me about what Congress intended? You're telling me that a Congress that supports the NRA intended all those collectibles to be forfeitable? Do you get that, Phil? Do you really believe that? I do, based on the plain language of the statute, Your Honor. That's what the statute provides. I'm talking about what Congress intended. So don't tell me what Congress intended. I mean, that's kind of a fiction we put on. We don't know what their intent was. Well, I suppose what we can do is talk about what the statute says and what the sentencing guidelines say. And when you look at the sentencing guidelines dealing with forfeiture, it's a separate section than fines, and this is the point I wanted to get to early on. When the Supreme Court said in Bajikistan that the court is to look to all of the penalties that apply, the full range of penalties that apply, fines and forfeitures are completely separate penalties under the statute and in the guidelines. The sentencing guidelines section that deals with forfeiture is – Listen. The sentencing guidelines have been declared illegal by the Supreme Court itself, haven't they? No, Your Honor. They have been declared illegal. They say they're illegal, but, well, let's just use them for advisory purposes. Correct. In another case. Yeah. But in Bajikistan, the Supreme Court said the court is to look at the statutory penalty and the guidelines penalty. The guidelines, the sentencing guidelines – yes, Your Honor. Go ahead and please finish. I have a question, but finish your answer. The sentencing guidelines, the entire statement in the sentencing guidelines relating to forfeiture is forfeiture shall be determined according to the statute. The statute here, section 924D1, explicitly provides that all firearms and ammunition involved in a violation of section 922G, which is the violation here, shall be forfeited to the United States government. So I'm just – that's what we're relying on. We're looking at the plain language of the statute. Yes, Judge. My understanding – please correct me if I'm wrong – is that government agents came to the Faro home on one occasion, found some weapons, and then came back with a second warrant sometime later and found additional weapons, maybe even substantially more weapons. Do I have that about right? Your Honor, during the execution of the first warrant, they found 868 guns, and then five days later they came back with a federal warrant and found an additional 696 guns. When they came the first time, did they ask Maria Faro how many firearms were in the house? I don't believe they asked her how many, but they asked both Mr. and Mrs. Faro if they had recovered all of the guns in the house, and they were told by both of them that they had. Somehow I have the idea that she said 500. Is that wrong? Well, there was a lot of discussion at the trial about how many guns she was aware of. She testified during trial that she thought the gun collection consisted of more than 500 guns, but she had no idea where they were because she'd never seen them. She said, in fact, that she had only seen about 20 guns, actually laid eyes on them and seen them. When they came back a second time, the greater amount were found in hidden compartments and sealed off rooms and an underground firing range, correct? There were no guns in the firing range, but all of the guns were found in, yes, built into walls and in a hidden room in the garage. At the execution of the second warrant, did Maria Faro resist the search at all? No, Your Honor, no. Did she cooperate? I don't know that she cooperated. I know that she did not refuse to cooperate, but I believe when they went back the second time, they merely asked her to sit in a room while they conducted the search. I don't think they asked her. And she complied? She complied, yes, she did. Thank you. May I ask you a question? You mentioned 924-D1, and I wrote down that that said all firearms and ammunition should be forfeited if it was in the possession of the felon, right? Yeah, it actually says if it's involved in a violation of 922-G, which is what? And then that's the basis of your saying that there should be no percentage at all awarded to Mrs. Faro. That's part of the reason. But if that had been urged the first time the case was here before us, we wouldn't be here a second time, would we? Well, no, we did urge that the first time around. But we didn't find we didn't agree with you. Because the court found that the district court had not engaged in the proper analysis because it hadn't considered Maria Faro's culpability in doing its analysis of the excessiveness. So you have to consider Maria's culpability. You can't just apply 924-D1. And I'm not. I just wanted to make sure of that. Okay, thank you. No, what the government is urging and what the government understood that the Faro won decision to be, what the government understood this court to be saying when it sent the case back the first time was, look, the district court needs to look at Maria Faro's level of culpability in connection with this offense. Despite the fact, and this court even recognized that after Vazucasian, there was a unique situation, and it was a difficult situation to apply the excessiveness analysis to a non-violator claimant, which is what Maria Faro is. But what this court also said was, we have an analysis for that. We established a test for that in the Eldorado case back in 1995. And while that test in general was abrogated by the Supreme Court in Vazucasian, that portion, this portion of the test that is based upon how you determine the culpability of a non-violator claimant, was left intact and is not inconsistent with the Vazucasian opinion. The government understood that to mean that in remanding to the district court, that the district court was intended to analyze this question under the Eldorado test, which it refused to do. Why the government believes that that is the correct thing to do, that is apply the Eldorado test, is because it answers the precise question that the court is asking in this case. That is, what is the culpability of a non-violator claimant? And how would you have us analyze or tell the district court to analyze the culpability? Well, by using the three-factor test in the Eldorado, in Eldorado, that's articulated in Eldorado. The government would suggest And not the four-factor test in Vazucasian? No. I think what's no, not at all. There has to be a synthesis of the Vazucasian factors, which because it was a criminal case, focus on the violator. The factors in 100,348, which the court also analyzed in FARO 1, but again, that addresses a violator who is the claimant. And Eldorado, and there has to be a synthesis of all three of those cases. All three of those things can be analyzed together. There is some overlap. But what's important about Eldorado is Eldorado deals specifically with a claimant who is not the person who violated the underlying offense that led to the forfeiture. And it focuses on their involvement in that offense, their participation in that offense. And what this court did when it remanded was it said, we like the look of, we like the general approach that was taken in Von Hoff in the Second Circuit. The Eldorado factors also blend perfectly with that analysis because that's what the Von Hoff Court wanted the district court to do. Look at this person who is not the main violator, but the question is what did they know, what is their responsibility for this? If we took Von Hoff as a template, then you would get 30 percent.  The court in Von Hoff says this is excessive, but we're remanding to the district court to determine how much it should be. And then there was a settlement, and the government got 30 percent. Why not follow that? Why don't you settle this case and take 30 percent and give the rest of it to Mrs. Farrow? Part of the reason, first, well, I guess I would point out that I don't think there's anything in the record about what happened in Von Hoff. There's a footnote that says that, 30 percent. Yeah, I guess, unfortunately, the reason I don't believe that that's an appropriate response here is because I've talked to the prosecutor in Von Hoff, and I know why that case was settled. And it's not appropriate here. Oh, okay. There were other factors. And I'll tell you something else. The other thing to keep in mind is we're dealing with very, very different subjects here. In Von Hoff, we were dealing with a marijuana grow that consisted of 69 plants that the government, the government agreed, was not a significant grow. The more serious penalty there was the husband's distribution and sale of the marijuana outside of the house, which everyone also agreed the wife was not aware of, did not participate in, and did not encourage or promote. That is not, none of those things are true here. This is far more. Judge Pregerson. May I ask a question? Let's assume a situation where a person has a fine gun collection, and it's all out in the open. But within that collection, you have some contraband firearms. You got that? Yes. Is that entire collection forfeitable? It depends on whether the person in possession Give me the pen. The person possesses this full collection I told you about. Maybe a thousand collectible weapons. And a hundred weapons that are not collectible. They're firearms. They're not collectible. Is that entire collection forfeitable? No, unless the possessor is a convicted felon. In which case, then yes, all of them are forfeitable because a felon cannot possess firearms, whether contraband or not. And that's what subjects them to forfeiture. Let me ask you, if that person knew that certain items were forfeitable and the others were collectible, does that same reasoning apply? You've got one firearm that's forfeitable. Because it's a machine gun, huh? Correct. Like an M16. And all the rest are rifles going all the way back to the Revolutionary War. War of 1812. Civil War. And the rest of it. A really, really terrific collection. But knows that that one weapon in there, or should know that, that one weapon is illegal. Under that scenario, your honor. And they find that illegal weapon. And they seize the whole batch. Not if that, no, they cannot. Not based on the fact that there's one machine gun. In that scenario, only that one machine gun would be involved in a violation of Section 922. Unless the possessor is a felon. In which case, all of them would be illegally possessed. And that is the critical difference here. But she was not a felon. And all that property was turned over to her. And the government doesn't dispute that that was all her separate property. Right. But she does not dispute that during the entire period, even though she was the owner of the property, Robert Farrell remained in possession of all of those weapons during the entire time until they were seized. That is also a stipulated fact in this case. How would he be in possession of it when he's in prison? During the time he was in prison, he was not in possession. But for many years, while those guns were in the house, he was there in the home and he was, as a stipulated fact, in actual possession of all of those weapons. In fact, what was crystal clear after trial is that, and this changed later because Maria Farrell's testimony changed significantly, but based on the testimony at trial, there were 1,679 guns in that house. And Maria Farrell was only aware of 20 of them. So there were 1,659 guns in that house that Robert Farrell was the only person who knew they were there. And he was in actual possession of those guns because he's the one who got them. He put them, he hid them in the walls. He built them into this room in the garage that Maria Farrell didn't even know about. Now, what became clear on remand is that Maria Farrell did know of at least 500 guns that were in her house, that were in a giant closet in the main hallway of her house that she said she didn't know about at trial. That was one of the major inconsistencies in her testimony. We've taken you way beyond your time. Thank you very much. Thank you, Your Honor. Can we give Ms. Jackson a minute of rebuttal? Your Honor, Your Honors, he said that Mr. Welk said that Maria Farrell on remand was said to have known the guns were there. She did not. And when the search came to the house, the ATF showed her the hidden compartments, the safes, the underground shooting range, and the compartment behind the garage, and she did not know about any of those. She didn't care about the guns. That was her husband's hobby, and she was raising the children, getting them ready for school. She did not know, and there was no inconsistency. If you read my opening brief and my response brief, I go through tedious effort to try to show her testimony has been remarkably consistent from day one, ever since she's been in this case. She's saying the same thing over and over again. She did not know, and even the judge said she didn't know the vast majority of the guns. Where did the statement that she knew about 500 guns come from? She knew her husband had a collection of 500 guns. She wasn't specific. They asked her, do you know where the guns were kept? And she said, I think in the office, in his office. And that's in either my opening brief or in my response brief. But that was her response. She says, I think. She wasn't even sure of that. And Robert had told her that he could keep the guns, his firearm collection, and that's why. That was incorrect. It was incorrect. Any other questions from my fellow panelists? No. Judge Pergerson, any further questions? No, I'm fine. Okay. Thank you very much, Ms. Jackson. Thank you, Your Honor. The case of United States v. Farrow, number 13-56425, is submitted for decision. We thank counsel for their argument, and we will now go into conference. All right? Thank you. Court's adjourned until tomorrow morning, 9 o'clock.
judges: Pregerson, Hawkins, Bea